O. Porter HILLARD et al *v.* J. T. STEPHENS
d/b/a STEPHENS PRODUCTION COMPANY et al

81-231                                     637 S.W.2d 581

Supreme Court of Arkansas
Opinions delivered July 12, 1982
[Rehearing denied September 13, 1982.]

*Putman, Gallman & Dickson,* by: *James W. Gallman;* and *Niblock & Odom,* by: *Walter R. Niblock* and *Priscilla Karen Pope,* for appellants/cross-appellees.

*Spence A. Leamons* and *Ball, Mourton & Adams,* by: *E. J. Ball,* for appellees/cross-appellants.

*Warner & Smith,* by: *Gerald L. DeLung* and *G. Alan Wooten,* for *amicus curiae* Tenneco Oil Co. and Shell Oil Co.

MILAS H. HALE, Special Justice. This case is before the Supreme Court pursuant to Rule 29 (1) (n) as it presents issues of first impression regarding gas rights. Appellants, plaintiffs below, the "Hillards," are lessors of seven gas leases in Franklin County, Arkansas. Appellees, "Stephens," are the lessees.

The first lease was executed on or about February 6, 1957, and all of the gas produced from the wells, except that part used, retained and/or purchased by the Hillards under the leases and as modified by letter agreements was sold for use off of the premises under long-term gas purchase contracts. Stephens paid appellants over the years based on "net proceeds" which Stephens received for the sale of the gas under the long-term gas purchase contracts. Appellants contend that royalties have been underpaid.

All of the gas leases were on the same oil and gas lease form then in use in the State of Arkansas, and more particularly, the Arkhoma basin of Arkansas, but each such lease contained certain modifications. The first five of these leases provide for a royalty to the lessor as follows:

> 3. (b) The Lessee shall pay Lessor as royalty for gas the equal one-eighth (1/8) of the value of such gas calculated at the rate of "~~five cents~~" *Prevailing Market Price at Well* per thousand cubic feet while the same is being sold or used off the premises, measured according to Standard Measurement Law in the State in which the above described land lays.

The term "five cents" as set out in the foregoing provision was struck out and the term "prevailing market price" was inserted therein. Stephens paid royalty to the Hillards and the Hillards accepted the royalty payments without complaint until this suit was filed on June 28, 1979, based on the "net proceeds" from the Ark-La contracts.

Two of the leases provided for a royalty to lessor as follows:

> 3. (b) The Lessee shall pay Lessor as royalty for gas the equal one-eighth (1/8) of the value of such gas calculated at the rate of ~~five~~ *seven (7)* cents per thousand cubic feet while the same is being sold or used off the premises, measured according to the Standard Measurement Law of the State in which the above described land lays.

The term "five" as set out in the foregoing provisions of the two leases was struck out and the term "seven (7)" was inserted therein. Stephens paid royalty to the Hillards under these two leases from the commencement of production of natural gas to July 21, 1970, computed on the "net proceeds" received from the Ark-La contracts. After July 21, 1970, Stephens paid royalty to the Hillards computed at a set amount of approximately $ .16 per MCF and was unable to explain why it did not compute the royalty based on the "net proceeds" received from the sale of the gas as in the past. The Hillards accepted the royalty payments from Stephens without complaint until this suit was filed on June 28, 1979.

On June 30, 1981, the trial court held:

1. That the "prevailing market price at the well" provision of the royalty clause in the first five of the leases requires that Stephens' royalty obligation be settled on the basis of "current sales" of the gas on a daily basis through November 8, 1978, and thereafter by reference to § 105 of the Natural Gas Policy Act of 1978, 15 U.S.C.A. § 3315 which fixes the maximum price for such gas at the price specified in the existing contracts under which Ark-La purchased the gas from Stephens; and

2. That Ark. Stat. Ann. § 53-511 (Repl. 1971) converted the two leases from the fixed price of $0.07 per MCF leases to "proceeds" leases and required that Stephens' royalty obligation be settled on the basis of the "net proceeds" received by Stephens for the sale of the gas to Ark-La under the contract. The trial court awarded Hillards a judgment for $193,749.00, with prejudgment interest. Hillards appealed and Stephens cross-appealed.

The Hillards contend on appeal:

1. That with respect to the first five of the leases, they are entitled to a royalty computed on the current market value of the gas in the field determined on a daily basis the moment the gas is produced and/or delivered to Ark-La under the gas purchase contracts;

2. That with respect to the last two of the leases (the fixed price leases of $0.07 per MCF) they were entitled to a royalty computed on the "net proceeds" received by Stephens from Ark-La from the sale of the gas under the contracts, because these leases were converted into "proceeds leases" under § 53-511, and alternatively, they own all of the gas produced under these two leases on and after June 28, 1974, because these two leases were forfeited retroactively by Stephens under Ark. Stat. Ann. § 53-514 (Repl. 1971).

Stephens contends on cross-appeal:

1. That the "prevailing market price at the well" under the five leases is determined by the contracts between Stephens and Ark-La, for the sale of the gas and Stephens' payment to the Hillards of the royalty computed on the price per MCF received by Stephens under the long-term contracts discharges in full its obligation to pay royalty.

2. That § 105 of the Natural Gas Policy Act (NGPA), 15 U.S.C.A. § 3315, determines the "market value" of the Hillard gas on and after its effective date on November 9, 1978, and Stephens' payment to the Hillards of the royalty computed pursuant to § 105 of the NGPA, 15 U.S.C.A. § 3315 (the price specified in the Ark-La gas purchase contracts) discharges in full its obligation to pay royalty.

3. That payment of royalty to the Hillards computed at the rate of $0.07 per MCF as specified in the last two leases discharges in full its obligation to pay royalty because §§ 53-511 and 53-514 do not apply to gas leases, since these gas leases constituted a present sale of gas in place with all the title to such gas being vested absolutely in Stephens and none in the Hillards.

4. That if §§ 53-511 and 53-514 convert the fixed price leases (the 0.07 per MCF) into proceeds leases, then all the gas leases are converted into proceeds leases by the statute.

5. Other grounds for relief based on the doctrines of estoppel and laches and Stephens objects to the awarding of pre-judgment interest.

The first issue to be decided here is whether the "contract price" that Stephens receives according to the gas purchase contracts with Ark-La is the "prevailing market price at well" under the five leases. We hold that it is. The gas lease constitutes a present sale of all of the gas in place at the time such lease is executed; and as the gas leaves the well head, the entire ownership thereof is in the lessee, none being reserved in the lessor. Once the lessee-producer drills a well resulting in the commercial production of natural gas on the leased premises, the lessee-producer has the immediate duty to market the gas. In order to market such gas effectively, it is the custom in the industry and is usually necessary for the lessee-producer to sell the gas under a long-term gas purchase contract. In *Tara Petroleum Corporation* v. *Hughey*, 630 P.2d 1269, 1273 (Okla. 1981), the Oklahoma Supreme Court stated:

> We have recognized this necessity of the market, and we believe that lessors and lessees know and consider it when they negotiate oil and gas leases. Lessors and lessees also know that during the term of a gas purchase contract gas prices may increase, perhaps substantially. During the term a producer's revenues, fluctuations in the production aside, will not increase. Yet if royalty must be paid on the basis of a "current," steadily-increasing "prevailing price," then the lessor's share will take an even larger and larger proportion of the producer's revenues.

Following the foregoing quotation, the *Tara* court considered an example of how the lessor would continue to receive a larger portion of the revenues for the sale of the gas, if the lessor's contention were followed. Similarly, in this case, on December 1, 1981, Stephens would be receiving from Ark-La under the gas purchase contracts the sum of $0.3390 per MCF for the Hillard gas, and the Hillards contend that they are entitled to be paid royalty computed on a "prevailing market price at well" of about $2.40 per MCF with their royalty portion amounting to $0.30 per MCF, while Stephens' revenues per MCF will remain constant. If this were true, then Stephens will keep only $0.0390 per MCF from the

$0.3390 proceeds received. As stated by the Oklahoma court in *Tara,* supra, p. 1273:

> This would not be fair to the producers . . . We do not believe that the lessors in this case . . . ever contemplated that the lessors' royalty could be over half of what the producers . . . received for the gas. The better rule — and the one we adopt — is that when a producer's lease calls for a royalty on gas based on the market price at the well and the producer enters into an arm's-length, good faith gas purchase contract with the best price and term available to the producer at the time, that price is the "market price" and will discharge the producer's gas royalty obligation.

See also, *Henry* v. *Ballard & Cordell Corp.,* 401 So.2d 600 (La. Ct. Appeals, 1981). We recognize that the Texas courts have taken a different approach, see *Texas Oil & Gas Corp.* v. *Vela,* 429 S.W.2d 866 (Texas 1968) and other Texas cases that followed it.

Here, the gas purchase contracts under which the Hillard gas was sold to Ark-La were effective as long as natural gas was produced from the Hillard wells. At the time these contracts were executed, all natural gas produced in Arkansas was then being sold to either Ark-La, or Arkansas Western Gas Company, or Arkansas Oklahoma Gas Company under long-term contracts. None of Arkansas production was sold or used outside the State of Arkansas. Stephens placed in evidence a substantial number of such gas purchase contracts that accounted for the sale of substantially all of the production in Arkansas with computerized graphs reflecting the comparison of the price per MCF of the Hillard gas received by Stephens under its contract with the price per MCF under the other Stephens gas purchase contracts, and in each such case the price per MCF of Stephens gas was substantially greater than the price per MCF received by the other producers in the field. In this respect, the circuit court found as a matter of fact that Stephens had fulfilled its obligations to market the Hillard gas and stated:

The Court, however, is of the opinion that the gas sale contracts entered into between Stephens Production Company and Arkansas Louisiana Gas Company were negotiated at arms-length and in good faith. Although there was no testimony introduced, questions were raised in the interrogatories to establish the percentage of interest of Stephens in Arkansas Louisiana Gas Company. The Court cannot conceive of businessmen of the caliber of the Stephens accepting a lesser amount for the sale of gas, the total of which would come directly to them, than they would receive as stockholders in a large gas distribution company which they would have to share with other stockholders and after additional distribution and administrative expense would reduce it further. The Court finds nothing in the record by which anyone in the early 1960s could have anticipated or predicted the inordinate increase in gas prices that has occurred in the 1970s.

We believe that this interpretation of "prevailing market price at the well" is consistent with the intent and understanding of both Homer Hillard, the Hillards' predecessor in title, and Stephens, and it is the only interpretation that operates fairly for the producer. It is not unfair to the Hillards. As long as the gas purchase contracts were reasonable when entered into, and as long as the law recognizes long-term gas purchase contracts as binding in the face of escalating prices, the law should not penalize Stephens who was forced into the gas purchase contracts in a large measure by its duty to the Hillards to market the gas efficiently and effectively. However, if the long-term gas purchase contracts executed by Stephens and Ark-La were not reasonable when entered into, if they are not at a minimum fair and representative of other contracts negotiated at the time in the field, then a different result obtains, because Stephens has not then protected its lessors (the Hillards) in discharging its duty to market the gas efficiently and effectively and there is no policy in the law requiring the courts to protect the lessee (Stephens) in interpreting the leases. But here the evidence contained in the record makes it abundantly clear and the trial court so found, that the Stephens and Ark-La purchase contracts were fair and

reasonable and that Stephens had discharged its obligation to the Hillards to market the gas efficiently and effectively. In any event, the burden of proving that the gas purchase contracts between Stephens and Ark-La were unfair or unreasonable at the time they were entered into is on the Hillards, *Tara,* supra, and in this case there is no hint that the contracts were unfair or unreasonable. Nor is it fair for the trial court to impose its own methodology and interpretation.

Since here the Stephens-Ark-La contract price per MCF of gas is the "prevailing market price at well," the lessors (the Hillards) were not entitled to any additional royalties from the producer (Stephens). In this respect the judgment is reversed on cross-appeal.

The last two leases provide for a royalty per MCF to the lessor (Hillards) as follows:

> 3. (b) The Lessee shall pay Lessor as royalty for gas the equal one-eighth (1/8) of the value of such gas calculated at the rate of ~~five~~ seven (7) cents per thousand cubic feet while the same is being sold or used off the premises, measured according to the Standard Measurement Law of the State in which the above described land lays.

The Hillards contend and the trial court held that the Hillards were entitled to have their royalty payments due them under these $0.07 per MCF leases computed on the "proceeds" received by Stephens under the long-term gas purchase contracts between Stephens and Ark-La because § 53-511 converted these last two leases from "fixed price" leases into "proceeds" leases. Section 53-511 provides:

> It shall be the duty of both the lessee, or his assignee, and any pipe line company, corporation or individual contracting for the purchase of oil or gas under any oil, gas or mineral lease to protect the royalty or lessors interest by paying to such lessor or his assignees the same price including such premiums, steaming charges, and bonuses of whatever name, for royalty oil or gas

that is paid such operator or lessee under such lease for the working interest thereunder.

Although the foregoing statute has been in effect since 1929, no cases were found where the statute was interpreted insofar as it applies to the production and marketing of natural gas.

If, as the trial court held, §̇ 53-511 converts all "fixed price" gas leases into "proceeds" leases, it follows that fixed prices favorable to a lessor or higher "fixed price" leases would be converted into "proceeds" leases. That is not the intent of the statute. Nor is it to prohibit fixed price contracts for oil and gas leases. Absent indications previously referenced, it is clear that §§ 53-511 and 53-514 are inapplicable in this case and could not under the circumstances cause Stephens to forfeit the leases to the Hillards.

We hold that Stephens' payment of royalty to the Hillards computed at the rate of $0.07 per MCF discharges its obligation to pay royalty under these leases.

Stephens contends that it is entitled to a judgment against the Hillards for the excessive payment of royalty under these $0.07 per MCF leases because it paid excess royalties. The record disclosed that Stephens did pay the Hillards additional royalties but the record fails to disclose evidence that such royalty paid was due to a "mutual mistake of fact" on the part of both Stephens and the Hillards. We hold that Stephens is not entitled to a judgment against the Hillards for the excessive royalty payments under the $0.07 per MCF leases.

Several other issues were raised on appeal. Holding as we have, we find it unnecessary to decide those questions.

The trial court is affirmed in part and reversed in part.

ADKISSON, C.J., and HOLT, J., not participating.

GEORGE O. JERNIGAN, Special C.J., joins in the opinion.

HICKMAN, J., concurs in part and dissents in part.

DARRELL HICKMAN, Justice, concurring in part, dissenting in part. The trial judge in a comprehensive and detailed set of findings meticulously gave his reasons for his decision in this complicated lawsuit. The majority has reversed those findings in every respect.

This is an oil and gas case and essentially there were two kinds of leases in question. The leases were signed by Homer Hillard and his wife as landowners and Stephens Production Company as lessee. Homer Hillard died and his heirs pursued this lawsuit to interpret and enforce the leases according to the law.

The first set of leases in question contained a clause which read:

The lessee shall pay lessor as royalty for the gas equal one-eighth of the value of such gas calculated at the rate of *prevailing market price at well* per thousand cubic feet . . . " [Emphasis added.]

The threshold question concerning the interpretation of this italicized language, which is largely ignored by the majority, is whether the language is plain and unambiguous. The trial court found that it was and, therefore, did not consider the abundant testimony offered by the Hillards and Stephens as to what the parties actually meant; or what "prevailing market price at well" meant to the oil and gas business community in the Arkhoma Basin where the land is located. So, to the trial court, the issue was not what the parties may have actually intended but whether the parties should be bound by the plain and ordinary meaning of the language in the lease. The trial court found:

. . . This court is not convinced that these words should not be considered in their ordinary and commonly understood meaning.

Even though the witnesses who testified and who were handling the day-to-day business for Stephens Production Company may have had in mind that the amount which Arkansas Louisiana Gas Company was

willing to pay for the gas at that time constituted the prevailing market price, it may have been an unfortunate selection of words which did not in reality express Stephens' real intent.

The words 'market price' have a very common and ordinary meaning with which all of us are familiar. They are used in various transactions and simply refer to what the commodity will bring when placed on the market. And, of course, the word 'prevailing' refers to the conditions in existence at any given time and are changeable from day-to-day or at other given periods.

It is my view, therefore, that the testimony as to the intent of the parties was not necessary to arrive at an interpretation of the words used in the lease with reference to the rate of royalty payments and, even though the Court heard this testimony, it has not influenced this finding.

Why does the majority find that "prevailing market price at well" cannot have a commonly understood meaning? The majority simply does not satisfactorily answer that question but considers only what it determines to be the real intent of the parties. Necessarily this means that careful consideration should be given to all evidence presented to the trial court during this lengthy trial. That the majority has not done.

Stephens argued to the trial court, and on appeal, that the language is ambiguous and that it was actually meant to create a "proceeds" lease; that is, the Hillards were to be paid a royalty from the proceeds Stephens received from a long term sale agreement it had made with Arkansas Louisiana Gas Company. There was evidence that officers of Stephens knew what a "proceeds" lease was and they could have easily inserted that term but chose not to. Instead, Stephens prepared and signed the lease which contained the common phrase "market price." I would submit Stephens knew exactly what it was doing. As the court stated in *Lightcap* v. *Mobil Oil Corporation*, 221 Kan. 448, 562 P.2d 1 (1977), when it considered similar leases: "There are two commonly recog-

nized types of leases employed in the gas industry, 'proceeds' leases and 'market value' leases." There is no doubt there were lengthy negotiations between Hillard and Stephens and there is evidence that unless Stephens had signed such a favorable lease agreement with Hillard, he would have gone to a competitor. In that regard, the court made this finding:

> Both parties admit that Arkansas Louisiana Gas Company, Arkansas Western Gas Company, and Arkansas Oklahoma Gas Company were all three buying and transporting gas intrastate from or in the Arkhoma Basin during this period although not a highly competitive situation. And, yet, there was testimony that Arkansas Western Gas Company maintained a pipeline not more than one mile from some of the Hillard Wells. This clearly could have constituted a competitive situation for the purchase of the Hillard gas; and since Mr. Walker testified that the negotiations between Stephens and Arkla were arms length and resulted from lengthy and extended conferences, it is the Court's opinion that Mr. Walker would not have hesitated to have gone to Arkansas Western had there been a substantial price differential.

Several states have considered the effect of similar language in natural gas leases. Generally Oklahoma and Louisiana have sided with the producers and the lessees in determining that the phrase "market value at well" actually means "proceeds." *Tara Petroleum Corporation* v. *Hughey*, 630 P.2d 1269 (Okla. 1981); *Henry* v. *Ballard & Cordell Corp.*, 401 So.2d 600 (La. Ct. Appeals, 1981). The leading authorities for the other position, and that adopted by the trial court, are the states of Texas, Montana, and Kansas. *Texas Oil & Gas Corporation*, 630 P.2d 1269 (Okla. 1981); *Montana Power Company* v. *Kravik*, 586 P.2d 298 (Mont. 1978); *Lightcap* v. *Mobil Oil Corporation, supra.*

Finding that the language of the lease should be given its ordinary meaning, the trial court proceeded to determine the market price. In doing so, the court, in my judgment, correctly rejected the exaggerated claims of both the lessors and the lessees, finding a reasonable middle ground. The

lessors essentially wanted the trial court to consider interstate sales in determining the market value; the lessees wanted the court to make the lease over into a "proceeds" lease, or at least limit the market to Franklin County. The trial court recognized the peculiar matter of the market in the Arkhoma Basin, there being essentially no strong competition between buyers and, as the finder of fact, used the available evidence to determine a fair market value. In doing so, the trial court considered the "fair field price", which is a price determined by the Arkansas Public Service Commission. Certainly, I would not agree that the fair field price would always be the controlling factor of the market value, but it was a factor to be considered and because of the peculiar nature of the market in that area, I cannot say the trial court was clearly wrong in its finding regarding the market value.

I agree with the majority that Act 222, Acts of Arkansas, 1929, [Ark. Stat. Ann. §§ 53-509 — 514] does not void the second types of leases. The Act is penal in nature and must be strictly construed. It only allows for three remedies: Forfeiture of rights, treble damages, or criminal sanctions. Ark. Stat. Ann. §§ 53-514 and 53-515. There are no provisions in the Act to revise the lease as the trial court did. Furthermore, the Act was obviously designed to penalize lessees that received kickbacks, or otherwise dealt improperly to deny a lessor his usual minimum royalty. There is no evidence at all Stephens acted in any way improperly. In fact, to the contrary, it appears the leases were entered into at arms length in every respect.